[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 248 
THIS was an action of ejectment for a farm of a hundred and thirty acres in Brandywine Hundred. The evidence was that John Beeson, recently deceased, and the owner of the premises from whom both the plaintiffs and the defendant claimed their title to them, died in possession of them in December 1858, intestate and without issue, leaving to survive him as his heirs at law, the children of two deceased brothers, Edward Beeson and Henry Beeson. The lessors of the plaintiff Eliza Guest, Mary Jane Guest, Lydia A. Beeson and Anna Maria Beeson, were the children and heirs at law of the brother Edward Beeson, deceased, and John Beeson the defendant and tenant now in possession, was a son of the other brother, Henry Beeson, deceased. On the 17th day of June, 1857, John Beeson deceased, the former owner of the premises, executed a deed of bargain and sale for the premises in question, to his nephew, John Beeson, the defendant, for the consideration as stated in the deed, of ten dollars, although it was proved on the trial that the farm was valuable and desirable on account of the beauty of its situation, and it was said, though not proved, that thirty thousand dollars had been offered for it. The validity of this deed was the only question involved in the case, which was disputed and denied by the plaintiffs on the ground of the extreme age, physical infirmities and mental imbecility and incapacity of the grantor at the date of it, to execute a valid instrument of such a nature. On this point more than thirty witnesses were examined during the progress of the trial. *Page 249 
The counsel for the defendant first proceeded and proved by one of the subscribing witnesses to the deed and by whom it had been drawn, that in June 1857, he was called upon by Thomas Beeson, a nephew of John Beeson deceased and a brother of the defendant, and informed by him that his uncle John Beeson wanted the witness to draw a deed for him, from himself to his nephew, John Beeson, and afterward brought him the will of the old man's father, to draw the deed from, which he did and went out with it on the 27th of that month to the old man's house to have it executed by him; found him sitting at his door, informed him of the object of his visit and that he had drawn the deed from him to his nephew, John Beeson for the farm he lived on and asked him if he understood it, to which he replied that he did. He then inquired of him where his nephew John was and he said he was out at the barn attending about the cattle. He next remarked to him that he had the finest farm in Brandy wine Hundred to which he replied "yes, it was a very fine farm." In a short time John and Thomas Beeson came from the barn to the house and they and the old man had some conversation together, which he might have heard, but to which he did not pay particular attention, and therefore could not repeat it. Thomas Beeson then invited them into the house and spoke to the old man about executing the deed. They then went in and the witness read the deed at length to the old man, who listened attentively to it, and made some remark in regard to it, whilst he was reading it to him, and his impression then was that his remark was in relation to one of the lines named in the deed. It was then spread upon a table and he signed it, and the receipt upon it for the purchase money which he had also previously read to him, which he did without any assistance from any one. The receipt was for ten dollars and when he read that to him, he laughed, and appeared the whole time to be in a pleasant humor. Thomas Beeson then observed to him that he would have two more deeds like *Page 250 
that to make and he replied it was likely he would. He had heard much of the old man, but had never become personally acquainted with him before; but he was satisfied from all he saw of him on that occasion, he was competent to make a deed. On cross-examination the witness stated that the deed was witnessed by himself and Thomas Beeson; and when Thomas Beeson called on him to write the deed, he told him his uncle was going to make deeds instead of a will, and that he was going to make a deed to his nephew John Beeson for a part of his land, and he would soon make deeds to two others of his nephews. He came after him and took him out to the old man's at the time he went out to have the deed executed. He had been told that he was an old man and very eccentric and he therefore took particular notice of him. When the deed was signed and executed, the old man took it, folded it up and handed it to Thomas Beeson saying, "Tommy take the deed and give it to no body, but the person for whom it was intended," and added, "I have confidence in you Tommy." Thomas Beeson replied it was all right and he would give it to no one but the person for whom it was intended, and would give it to no body but John Beeson. Thomas Beeson paid the witness for his services before he left the carriage on his return home.
The other subscribing witness to the deed testified that not a great while before it was prepared and executed, one morning the old man, his uncle, and his brother John Beeson came down to his store in Brandywine Village, and told him they were going in town to take counsel of a lawyer about making a deed from the old man to John Beeson, and they all went together to see Mr. Gordon in regard to the matter. When they got into the office he said to the old man, you can now ask Mr. Gordon what you wish to know. He replied, "faith Tommy I think you can put it to him better than I can." The witness then told Mr. Gordon what the old man wished to know, which was whether he could make a good deed to his *Page 251 
nephew John Beeson for a part of his land, as he wanted to dispose of the farm in question to his nephew John and to give it to him legally, and wished to know if he could do it by deed legally, for he did not want to make and leave a will. Mr. Gordon gave him the advice he desired on the subject, and he left entirely satisfied. He was present when the deed was executed, and signed it as one of the subscribing witnesses. The other subscribing witness who wrote it, read it entirely over to the old man before he executed it, and he listened attentively to him whilst he was reading it; when he came to the lines set forth in it, which were taken from the will of his father dated a great many years back, they called for certain trees, when the old man interrupted him with the remark, "but in faith, you will not find the trees there now." On cross-examination, the witness further stated, that it was by the request of the old man and as his agent, he called on Mr. Wiggins to draw the deed, and took the will and other papers to him to prepare it from, and he fixed the day when he was to have it ready and go out with it. On that day Mr. Wiggins, his little son, and himself went out in a carriage together. Witness procured the conveyance but did not pay for it himself. His brother John Beeson gave him the money and he paid Mr. Wiggins for his services and also for the conveyance. When they got out there, they went into the house and he introduced Mr. Wiggins to his uncle. After the deed was executed, Mr. Wiggins asked the old man, if he acknowledged that to be his act and deed, and he replied "I do." He then handed it to the old man, who folded it up and handed it to me saying, Tommy you have my other papers, take this and take care of it. John Beeson, his nephew, was not there in the house during any portion of this time, but was out about the barn. The old man said he did not give away his living On the farm. Witness kept the deed about eleven months and then sent it to the Recorder's Office in New Castle to be recorded, and John Beeson, his brother, got it from the office. The *Page 252 
old man told me to take care of it, but he did not say how long, and I kept it until then, because we had by law a year to have it recorded in. Witness did not keep the matter a secret, but he never made any mention of it to the old man's other nephew's, or nieces; and there never was any agreement between his brother John and himself that he was to have anything for his agency, or services in any of these transactions, and the latter never paid him anything, and he never made any claim upon him for anything on account of it. He might have said that he ought to give him something for his time and trouble in the matter. He was in the habit of going to his uncle's frequently; they had always been on good terms and there never had been any coolness between them. Was never there but twice on this business before it was executed and finished. Saw no money paid him for the deed and does not know that any was ever paid him for it. Never told Wm. Talley he had a great deal of trouble and had to go and see the old man a great many times, before he could get him to make the deed to his brother. When the deed was executed, Mr. Wiggins remarked that it ought to be recorded and the old man assented to it. He never took any liquor out to the old man. The old man did not drink liquor and was opposed to the use of it, as a beverage. His first connection with the transaction under investigation, began by his uncle's sending for him and telling him that he wanted to make a deed to John for that part of the farm, when he told him he had better take counsel on the subject.
The counsel for the defendant here rested his case for the present, when the counsel for the plaintiffs proceeded and proved by various witnesses the following facts and circumstances touching the condition and capacity of the grantor.
One of them called with a friend to see him in 1857, and found him sitting before the fire with his head between his knees in a kind of stupid way. Mr. John Beeson, the defendant, was there and told me to ask him *Page 253 
the price of a heifer he had in his herd, and he asked the old man what he would take for her, when for the first time he looked up, looked straight at him and said forty dollars. He offered him thirty-two, which was about the value of her; he said if he could not give forty dollars, he could leave her. He was then ragged and in a half-naked condition. Some of his toes were gone and he was bare-footed, and he was in a wretched state. Witness said he ought to be taken to the poor-house, for he was not fit to take care of himself. The old man was hard of hearing and he did not think he heard his remark. His nephew John said he could not get him to leave there, and he thought a child five years of age, was as capable of taking care of itself, as he was. In regard to selling his hiefer, however, he talked as rationally as any other man would. Another witness stated that he had lived near him and had transacted business with him for more than twenty years up to 1856, but none since, except that he sold him an ox about harvest in 1857. In March 1856, the old man got his feet frozen and badly frost-bitten. He said he thought he heard some one getting his corn out of his barn at night and he went out in the snow to stop it, and that was the way it happened. He said there was a corn-shelling machine going at the time, and he asked the witness the next day, if he did not hear it then, for he said there they are now, getting it out again! It was all a delusion, and witness ceased to deal with him after that. He always slept on the floor, and he never knew him to sleep on a bed, and he had heard him say that he would never change his clothes, until they changed off of him. John Beeson, his nephew, was not much about him, until after he got frozen in 1856; but, after that, he was there more frequently. The mother of the plaintiffs was next examined, and stated that she had known the grantor from her childhood and that he was eight-five years old at the time of his death. In 1852 he had a severe attack of erysipelas, and after that, he failed very rapidly both in body and mind. Sometimes *Page 254 
he seemed to know what he was about, and sometimes he did not. From March 1855 to March 1857, he was entirely alone in his house, and she had his meals cooked and sent them to him. John Beeson, the defendant, was sometimes there, but she never saw him doing anything particularly for him. He was a strange and eccentric man all his life, and for twenty or thirty years, he had never slept upon a bed. Another witness testified that she had known him fifteen years, and in 1845 had lived six months in his house, and after that for ten years with her husband in a tenant house on his premises, and had seen him every day, and sometimes four and five times a day. In February 1857, he was sometimes out of his mind, and at other times more sensible. He was very dirty and filthy in his dress and she never thought him right sound. He put on a shirt in September and never took it off until the following month of May. His memory was very bad toward the last, and sometimes he would not know persons he ought to have known, and would say that persons had been there and staid all night, when no one at all had been there. In September 1857, she had been to Wilmington, and when she returned, he asked her the news, when she told him there was no news, except all the talk was that he had made a deed, to which he replied, faith, he had made no deed, if they have got a deed, they made it themselves. He did not like Thomas Beeson, and she never saw him there more than two or three times in her life; and he had told her himself that the old man would not talk to him when he went there. After 1852 there was a great change in him, and frequently he was out of his mind. Sometimes he would talk sensibly for a few minutes, and in the next five minutes he would be away off in Ireland, or in the West Indies, with a barrel of Poenic apples, and you couldn't tell hardly what he was talking about. In February, 1857, he mistook John Beeson, his nephew, for Christopher Springer, a man sixty years old, who had lived with him a great many years before, and thought he was from the *Page 255 
poor-house. Two other witnesses who had known him a long time and one of whom had been in his employ and had lived with him, proved that he never was a very sensible man, or he certainly never would have lived as he did; but there was a great change in him in the latter years of his life and he then began to see strange things and to talk in a simple manner, and the older he got, the more childish he became. The latter stated that the old man disliked his nephew, Thomas Beeson, and he never heard him speak to him in his life, when he was there. The testimony of another woman who had kept house for him in 1850 and 1851, was, that he did not live like any body else. After that, there was a great change in him, and she was in the habit of going to see him occasionally. He did not then talk sensibly, and sometimes would not talk any. The last time she was there and which was the fall before his death, he did not know her. That he was always strange and never slept on a bed, but would lie on some old rags on the hearth with a block of wood to rest his head upon; and never would take his clothes off to have them washed; even when they were stiff with grease and dirt and black as the pot, he would say that they did not need it, and washing wore them out; and he did not even wash his face and hands. The testimony of several other witnesses who were afterward examined was also to the same effect. Wm. Talley being called and sworn for the plaintiffs, testified that Thomas Beeson had told him that his brother John would never have got the deed for the place, but for him; that he interceded and had to go and see the old man six or seven times, before he could get it done. That he once requested the old man to deed him a small house and about five acres on one part of the land, but he refused, and told him whoever got it when he was gone might do it, if he chose. That his brother John would not deed it to him, but told him he should be well paid for his services. He also testified that Thomas Beeson had told him that he had a very hard time to get the old man to sign the deed, and *Page 256 
that his brother, John Beeson, had told him he should be well paid for it.
The rebutting evidence for the defendant was to the effect that the grantor had always been a peculiar and singular man in some respects, indifferent to dress and slovenly in his habit, but shrewd and sensible in matters of business and particularly close to his own interests, and continued so up to the period of his death. That he had early declared his purpose not to make a will, but to dispose of his land by deed as a preferable and more certain way of conveying it to such as he might wish to have it, and had repeated the declaration but a short time before the deed in question was executed in a conversation with one of the witnesses examined, and requested him as he passed through Brandywine to tell Thomas Beeson, he wanted him to come up and see him and to bring Mr. Wiggins with him; and added that several persons had been wanting to buy the place where he lived, but he would not sell it, and then asked him, if he thought his nephew, John Beeson, would sell it, if he deeded it to him, and had years before told him that he did not care what became of the rest of his land, but he did not want his home place to go out of the name. Numerous other witnesses, who were well acquainted with the grantor, and some of whom had had business transactions with him up to the time of his last illness, were called and examined on the part of the defendant, all of whom, by the facts and circumstances which they detailed, afforded more or less proof of his capacity to make a valid deed at the time when the instrument in question was executed by him.
This is an action of ejectment brought by certain of the heirs at law of John Beeson, deceased, to recover their share, one moiety, of certain land of which the deceased was possessed at the time of his death, situated in Brandywine Hundred in this County.
It is admitted by the defendant, that the land in question was devised to the deceased by his father, as long ago as the year 1788, and that he held and possessed the land up to the time of his death.
It is also admitted that the plaintiffs are heirs at law of the deceased. These facts, therefore, are not in dispute, but admitted, and make out a prima facie case in the absence of opposing or countervailing proof, entitling the plaintiffs to recover in this action.
To this case however, the defendant answers that he is the bonafide owner of the land, and that he holds the same by force and virtue of a valid deed of conveyance from the deceased, bearing date the 27th of June, 1857. *Page 262 
This deed has been offered in evidence — it is in the common form of such instruments, and purports, for the nominal consideration of ten dollars to convey the land to the defendant in fee simple. The grant, under these circumstances, may be considered as a gift, and not a purchase. To this deed the plaintiffs have taken exception. They object to its validity on several grounds; either of which, if found to be true, is vital and fatal to the claim and title of the defendant. His possession and claim of title, rest upon this deed, and they must stand or fall upon the question of its validity, as a sufficient legal conveyance, of the land in dispute.
They object, in the first place, that the deceased, John Beeson, the grantor named in the conveyance, was not competent, by reason of unsoundness of mind, to execute and deliver a valid deed.
This is altogether a question of fact, to be determined by the jury, from the evidence in the cause. It is therefore, peculiarly and appropriately your duty, in respect to which, it would be improper for the court to intimate any opinion.
And, we may here properly remark, that the state or condition of mind of a person, where his mental soundness is brought into question, is to be proved as any other fact in the cause. It is true, you can not, in the nature of things, look in upon the human mind, and see its operations and true condition, or behold its thoughts or intentions in the processes of their birth and development. It is invisible to the bodily eye in natural light. You are compelled, therefore, to look to the external acts, or other outward visible manifestations of the party, as indicating his inward mental condition, or status.
His age, his health, his mode of life, his manners and conversation, his acts and general conduct, both before and after the execution of the deed, are legitimate and proper matters to be considered by you, affording as they do, the only lights by which you can be safely guided to a wise and just solution of this question. You will therefore, most earnestly and deliberately consider all these matters. *Page 263 
Although the fact of soundness or unsoundness of mind, may be, and often is, a question difficult to determine; yet, when the fact of unsoundness is once settled, the rule of law, in respect to the fact of the execution and delivery of a deed, during the existence of this unsound condition of mind, is both plain and peremptory. The deed, under such circumstances, is uttlery inoperative and void. But the unsoundness of mind, to work this result, must be such as to render him incapable, under the circumstances, of understanding and comprehending the nature and character of the act he was doing, and the legal consequences likely to flow from it.
So too, as to a weak and impaired mind, or mental imbecility, not amounting to absolute lunacy or utter unsoundness; if undue influence, imposition, or fraudulent concealment was practiced or exerted on or over such a mind, a deed made and obtained under such circumstances, would be void, and void on the ground of fraud.
But the fraudulent imposition or influence to be sufficient to invalidate a deed, must be of such a character, as to impose upon and mislead, or such as to overbear the feeble will of the party to such a degree as to deprive him of his free and voluntary agency in respect to the transaction. His mind must be so enfeebled, or weakened, as to render him incapable, under the circumstances, of resisting the influence, and of asserting his own independent will.
The act of executing the deed, and the intention or will to do so, must concur — they must go together. It must be his intention and will to do it, or it is not his act and deed. The intention to do so, must be present in the act, and the act must be the result of his free voluntary determination. Fraud will vitiate any act, but it must be shown to exist, — it cannont be presumed without proof.
They object in the second place that the deed was not delivered. They contend that there was not only no actual delivery by the grantor, old John Beeson, nor by *Page 264 
any one authorized by him to deliver it; but further, that there was in fact, no intention on the part of the grantor to part with his control over the deed, or to divest himself of his estate in the land during his lifetime, or that it should be delivered to his nephew, John Beeson, Jr., during his, the grantor's life.
Now, as to the law in relation to the delivery of a deed. It is absolutely essential to the validity of a deed, that it be delivered by the party making it, himself, or by some person authorized by him to do so. It can only take effect from delivery; — without delivery it is a void deed, ab initio, that is, from the beginning.
A delivery, may be made either absolutely, that is to say, to the party named as grantee in the deed, or it may be conditional, that is, it may be delivered to a third person to hold till some condition be performed, or till the happening of some future event, and in such case, it is not considered as delivered, as a deed, but merely as an escrow or scrowl; which, cannot take effect as a deed, or in fact become the deed of the party, until the performance of the condition, or the happening of the future event contemplated by the grantor at the time he signed and sealed it. To make the delivery of a deed conditional, or its validity dependent upon the happening of some future event, it is not necessary that any express words to that effect should be used at the time, but the conclusion may be drawn from all the facts and circumstances attendant upon the transaction.
So too, in respect to the delivery of a deed absolutely no express words, or particular form, or ceremony is necessary; it will be sufficient, if the party making the deed, satisfactorily signifieshis intention, in any manner, whether by word or act, to deliver it, or put it into the possession of the grantee; — as, for example, by throwing it on the table with the intention that it may be taken up by the grantee, or by any other like act, signifying his intention to part with the deed, and to place or pass it into the possession of the other party. *Page 265 
And an actual delivery of a deed to a third person absolute in its character, for the use and benefit of the grantee, and so declared to be, if intended by the grantor to take effect as a conveyance of the land presently, that is, immediately, so as to divest his title, would be a sufficient delivery in as much as, the grantee is presumed to assent to that which is for his own benefit. But if the grantor did not mean or intend that the deed should take effect immediately, so as to divest his estate, but delivered it to such third person merely for safe custody as the depositary of it, and subject to his future control and disposition, this would not be such a delivery as is required by the law in order to make it a complete and valid deed.
It is proper I should here remark, that we do not consider this the case of an escrow; and I have only adverted to the doctrine of the law on the subject, because the counsel on both sides, have in the course of the argument, deemed it expedient to discuss the question.
The law presumes a man to be sane, or of sound mind, until the contrary is shown. He is bound by all his intentional acts. If insane, he can have no valid intention. He is presumed to be competent to make a deed, until it is shown that he is incompetent, and the burden of showing this devolves on the party objecting to the validity of the deed.
You will therefore consider and determine from all the evidence before you,
First, Whether the deceased, John Beeson, the elder, signed and sealed the deed of the 27th of June, 1857, the due and valid execution and delivery of which, is the subject of controversy in this action — and whether he did so freely and voluntarily, without any undue, improper or fraudulent constraint? If he did not sign and seal it, freely and voluntarily, without any undue or fraudulent constraint, then the deed is not his deed, but is nugatory and void, and your verdict should be for the plaintiffs. But if you shall be satisfied, that he did sign and seal it, of his own mind, without such unlawful constraint, *Page 266 
then you will consider further, and determine according to the evidence.
Second, Whether, at the time of so signing and sealing, he was capable of making a valid deed — and this inquiry necessarily involves the question of his mental condition, or status at the time, the soundness or unsoundness of his mind. And this question, allow me to say, is of such importance, as to demand at your hands, a careful, earnest and sifting examination and consideration of all the evidence which has been adduced on this point.
If, from age, or disease, or the visitation of providence, or from any other cause, no matter what, his mind was so unsound as to render him incapable of comprehending and understanding the nature and character of the act he was doing, and the consequences, in respect to himself and the estate, which would flow from it, if he had not mind enough to know, if he had not sufficient mental consciousness to comprehend that the effect of that act, if consummated, would be to divest his estate and interest in the land, then we say to you, that he was of unsound mind, according to the legal signification of these terms, and the deed would be void on this ground. But if you shall be of the opinion that his mind was not so utterly unsound as to invalidate a deed executed by him of his own free will, yet if you shall be satisfied from the evidence, that there existed great weakness or imbecility of mind, from age, disease or other cause, and that such undue influences were exerted upon him as to overcome his free volition and will, amounting to such a degree of constraint, as the deceased, in his then weak state, was unable to resist, — thus inducing or constraining him to do that, which, if left to his own unfettered and free mind, he would not have done — or if, in other words, it deprived him of his free agency, and prevented him from doing what he pleased with his property, then we say, if such be the case, the deed is void on the ground of fraud, and your verdict ought to be for the plaintiffs. But if after having maturely and fully considered the evidence *Page 267 
in this cause, touching the questions of unsoundness of mind, and of undue or fraudulent influence, you shall be of opinion that it has not been shown that either of these facts exist, to the degree or extent which I have heretofore indicated, then, you will consider and determine from the evidence —
Third, Whether the deceased, John Beeson, the elder, delivered the deed of the 27th of June, 1857, to his nephew, John Beeson, Jr., the defendant, absolutely, or whether he delivered it absolutely and unconditionally, to Thomas Beeson for the use and benefit of the said John Beeson, Jr., declaring at the time that he so delivered it, and intending that it should take effect and operate as a then present conveyance of the land; and this intention may be inferred if the facts in the case warrant such an inference. If you shall find such to be the real facts in the cause, as disclosed by the evidence, then your verdict should be for the defendant.
The mere recording of the deed, even by the authority of the grantor, is not in itself evidence of delivery. A delivery once complete and absolute, cannot be effected by anything the grantor may afterward say or do; nor will the mere fact of the deed's remaining in the hands of Thomas Beeson under instructions from the grantor to retain possession of the same until the grantor's decease, and then to hand it over to the grantee, vitiate the transaction, or defeat its operating as a present conveyance.
But a deed to have any operative effect whatever as such, must be delivered in the grantor's life-time — the delivery — that, which the law considers a delivery, cannot be made after the grantor's death.
If on the contrary, however, you are satisfied that the deed was not delivered absolutely by old John Beeson, nor intended by him to take effect as a then present conveyance, but was handed by him to the said Thomas Beeson merely for safe custody or keeping, without intending to part with his future control over it, then, in such, case, we say to you that this would not amount to a valid *Page 268 
delivery, either in law or fact, although he may have intended, in case he should make no other disposition of it, that the deed should be delivered to the defendant, John Beeson, Jr., after his, the grantor's own death. And no delivery by Thomas Beeson in the grantor's life-time, without his authority or consent, would be valid. If such in your judgment, be the fact in the case, your verdict should be for the plaintiffs.
 Verdict for the defendant.